**EXHIBIT 4**

**STANLEY JAWORSKI ENGINEERING REPORT**

**ENGINEERING REPORT**

**INVESTIGATION OF HASLETT'S LEAF TRIMMER INCIDENT**

**DISTRICT COURT, CITY & COUNTY OF DENVER, COLORADO**
**CASE NUMBER: 2021CV30269**

**By:**

STANLEY JAWORSKI, P.E.

18 APRIL 2022

RFI FILE: 21RM0189 Thomson-Haslett



EXHIBIT 4

**INVESTIGATION OF HASLETT'S INCIDENT**

**ENGINEERING REPORT**                                                                                   **18 APRIL 2022**

**1.0     INTRODUCTION**

On or about Wednesday, September 18, 2019, Marcie Haslett (Haslett) had her finger injured while she was using a Twister T2 Trimming Machine (the trimmer) at her place of employment, Los Suenos Farms, LLC, 46795 State Highway 96 in Avondale, Colorado.  Haslett was clearing debris from the trimmer when her finger came into contact with the trimmer's helix blades.[1] The incident trimmer, model T2, manufactured by Defendant Keirton Inc., serial number US200959, was purchased from Keirton Inc. by Los Suenos Farms around 11 January 2017.

The purpose of my investigation is to determine if the trimmer is defective in a manner that was a cause of Haslett's incident.

Robson Forensic, Inc. invoices at the rate of $455 per hour for my services and I have no financial interest in the outcome of this case.  To date I have billed approximately $12,000.  I am a Professional Engineer (Mechanical) and have experience designing, fabricating, and installing machine guards.  A copy of my curriculum vitae and testimony history are attached to this report.  I may use any or all the items listed below, as well as any standards/ publications referred to (or referenced to) in this report, to support my opinions and findings.

**2.0     INFORMATION AVAILABLE**

1. Complaint, Haslett vs. Keirton Inc, 2021CV30269; 25 January 2021
2. Designation Of Non-Parties At Fault 2021CV30269; 21 April 2021
3. Seven (7) photographs of the incident machine from Thompson; undated
4. Video of incident from Thompson, undated
5. Notes and photographs from my inspection; 31 March 2022
6. Twister T2, Owner's Manual, undated
7. Plaintiff's first set of interrogatories and RFP to Keirton; January 2022
8. Bates Stamped documents Keirton 001874-001964

**3.0     DESCRIPTION OF THE LEAF TRIMMER**

The incident trimmer is used to trim the leafy material away from the flowers or "buds" of cannabis plant material. (Figure 1) The rough trimmed cannabis is fed into the trimmer's tumbler. The tumbler is oriented on a grade, so that the material travels down the tumbler and exits at the other end from where it is fed.

---

[1] Complaint, Haslett vs. Keirton Inc, 2021CV30269



1

EXHIBIT 4



**Figure 1: Incident trimmer**

The trimmer's leaf cutting action is provided by the interaction of the revolving helix knife, located under the drum, with a fixed bed knife. (Figures 2&3)



**Figure 2: The trimmer's drum and fixed bed knife**



**Figure 3: Revolving helix knife and fixed bed knife interaction**

The tumbler is a spinning drum with slots. Suction provided by a vacuum leaf collector draws the leaves through the spinning drum's slots, into an adjacent fixed slot containing the trimmer's revolving helix blade. (Figure 4&5)



3

EXHIBIT 4


Figure 4:  The trimmer's drum and revolving helix blade


Figure 5:  Close up detail of helix knife - drum interface

4

EXHIBIT 4

**4.0     DESCRIPTION OF HASLETT'S INCIDENT**

At approximately 11:15 a.m., on Wednesday, September 18, 2019, Haslett was clearing debris off the vacuum side of the tumbler when her left hand came into contact with the trimmer's helix blades.  Figure 6 is a clip taken from security camera video immediately preceding the incident.



Figure 6:  Haslett's incident

**5.0     ANALYSIS**

Haslett was exposed to two distinct hazards, operating sequentially.  First, her fingers were drawn into the machine's point of operation by an inrunning nip point created between the rotating drum and the stationary base of the machine.  Once within the danger zone, Haslett was then exposed to the shear hazard created by the revolving helix knife.

An inrunning nip point hazard is created by a mechanism with one or more rotating parts.  Whenever a part rotates in proximity to another rotating or stationary part, an inrunning nip point hazard is created.  In Haslett's case, the inrunning nip was created by the rotating drum and the fixed (stationary) base of the machine.

**Keirton's failure to provide an adequate guard for the machine is a design defect, renders the machine unfit for its intended purpose, and was the cause of Haslett's incident.**



5

EXHIBIT 4

Keirton should have provided a fixed barrier guard to deny access to the inrunning nip hazard. By denying access to the inrunning nip, Haslett would therefore not have had access to the revolving helix blade and her injury would have been prevented.

**Had Keirton provided an adequate guard, Haslett's injury would have been prevented.**

Keirton could have provided a fixed barrier guard. Such a guard fabricated from 16 gauge stainless steel and affixed to the trimmer by machine screws would not defeat the utility of machine and would not impose a significant cost penalty. (Figure 7)



**Figure 7: Exemplar guard**

**The provision of an adequate guard would not defeat the utility of the machine, nor would it impose a significant cost penalty.**

Industry guidelines for barrier guards have long been known. As early as 1913, the National Safety Council (NSC) has offered guidance to engineers and machine designers concerning the promotion of safety and protection of human life in industry. The NSC has recommended the use of a guard to protect operators from direct contact with moving machine parts, like the incident nip and revolving knife at the point of operation since at least 1964.[2] Guards are not just intended to prevent protection from things like machine failure and accidental contact. Guards are also intended to protect operators from human failure, resulting from such things as curiosity, zeal, distraction, fatigue, indolence, worry, anger, illness, and deliberate chance taking.[3] The best guard is often the guard provided with the machine. A manufacturer's guards are designed to be

---

[2] <u>Accident Prevention Manual</u>, 5th edition, National Safety Council, 1964, P 22-7.
[3] <u>Accident Prevention Manual</u>, 5th edition, National Safety Council, 1964, P 22-2.



6

EXHIBIT 4

an integral part of the machine and are therefore superior to homemade guards in appearance and convenience of arrangement.[4]

The NSC advises that the typical guard for an inrunning nip is a fixed barrier guard that denies access to the hazard. The guard should not allow the operator's hands into the danger zone.[5]

The guidelines by the National Safety Council's 1964 Accident Prevention Manual are long known and applicable to the hazard presented by Keirton 's trimmer. Keirton had ample time to become aware of the hazard and the need to guard it.

**Keirton's failure to comply with long known industrial guidelines deprived Haslett of the protection provided by such guidelines.**

### 6.0   FINDINGS

Within the bounds of reasonable engineering certainty, and subject to change if additional information becomes available, it is my professional opinion that:

1. Keirton's failure to provide an adequate guard for the machine is a design defect, renders the machine unfit for its intended purpose, and was the cause of Haslett's incident.

2. Had Keirton provided an adequate guard, Haslett's injury would have been prevented.

3. The provision of an adequate guard would not defeat the utility of the machine, nor would it impose a significant cost penalty.

4. Keirton's failure to comply with long known industrial guidelines deprived Haslett of the protection provided by such guidelines.

Stanley Jaworski, P.E., CFEI, CVFI

---

[4] Accident Prevention Manual, 5th edition, National Safety Council, 1964, P 22-6.
[5] Accident Prevention Manual, 5th edition, National Safety Council, 1964, P 22-8.



7

EXHIBIT 4