IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-01112-MEH

MARCIE FAYE HASLETT,

    Plaintiff,

v.

KEIRTON, INC. and
KEIRTON USA, INC.,

    Defendants.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**

    Defendants have filed a Motion for Summary Judgment. ECF 46. It is fully briefed, and the Court finds that oral argument will not materially assist in its adjudication. For the following reasons and based on the submitted record, the Motion is granted.

## BACKGROUND

**I.    Claim for Relief**

    Plaintiff worked at "Colorado's largest cannabis cultivation" farm. ECF 59 at 1. For her job, Plaintiff used as a "Twister T2" leaf trimmer[1] that Defendants manufactured and sold to the farm in October 2017. She was operating the trimmer on September 18, 2019 when plant debris

---

[1] To provide context to Plaintiff's claim, the Court notes that the trimmer reasonably could be described as a commercial-grade machine. It sits in a moveable cart. On one end of the cart is a hopper into which plant material is fed. Connected to the side of the machine is a vacuum which pulls the plant down into a horizontal rotating tumbler in the middle of the cart. Blades sit underneath the tumbler that trim away plant material protruding out the tumbler's slots. The remaining plant material then exits the tumbler out the opposite end.

built up in or around the tumbler. While clearing the debris away, her left hand was pulled inside where the blades are. The trimmer was turned on, and the spinning blades injured three of her fingers.

Plaintiff brings one cause of action for strict products liability under Colorado state law, under which she expresses two theories of wrongdoing. First, she contends that the device, which lacks a protective guard, has an unreasonably dangerous design. Second, she argues that Defendants failed to warn her of the particular risk that the trimmer posed.

There appears to be no significant difference between the two Defendants for purposes of Plaintiff's claim. The Court will refer to both simply as "Keirton" in the singular for ease of reference.

## II. Statement of Undisputed Material Facts ("SUMF")

1. Keirton manufactures the Twister T2 trimming machine. It first began to sell "[t]he Twister product line . . . in 2009," as its founder and president, Jason Evans, stated in his affidavit, (ECF 46-1 at ¶ 5), and "first start[ed] to sell the Twister T2 . . . sometime between 2009 and 2010," as Mr. Evans testified at his deposition (ECF 59-1 at 4).

2. In his affidavit, Mr. Evans reported "no incidents or injuries involving usage of the Twister or any of the models within the Twister T2 product line from the original date of sale of the first Twister product through September 18, 2019." ECF 46-1 at ¶ 7.

3. In his affidavit, Mr. Evans denied making any "material changes" to the Twister T2 through September 18, 2019. *Id*. at ¶ 6. Keirton answered an interrogatory about whether there have "been any changes in the design of [its] trimmers" in the affirmative, identifying two made in 2012. For the first one, Keirton replaced the device's toggle switch to large industrial push buttons with a large stop button. The second one concerned how the trimmer was made for sale in

Canada. In order to bring the trimmer into compliance with Canadian regulations, Keirton added a large tumbler cage. ECF 59-2 at 3. Another interrogatory asked about changes (made during an unspecified period of time) "to enhance the safety of the product." Keirton answered it by identifying: "low torque tumbler that can be easily stalled," "blades enclosed in stainless steel shrouds," "pronounced stop buttons for easy shutoff," "extensive warnings in owner's manual as to operations," and "extensive decals highlighting moving parts and risks." *Id*. at 4. At his deposition, Mr. Evans referenced adding (1) "the guard over the tumbler" and (2) push buttons with safety stops as an upgrade to the device's electrical components as changes made during the time the product was on the market. ECF 59-1 at 7.

     4.     The Twister T2 is designed to trim marijuana leaves utilizing both a vacuum and a blade. ECF 6 at ¶ 6.

     5.     An Owners Manual was provided for the Twister T2 that included warnings regarding its use. ECF 46-2.

     6.     It advised the user to "keep body parts away from fast moving parts" "[t]o reduce the risk of injury." *Id*. at 8.

     7.     It instructed users not to "reach inside tumbler while machine is plugged in." *Id*. at 9.

     8.     It contained instructions for proper cleaning. First, the Owners Manual suggested cleaning[2] as a means to "ensure performance and prolong the life of the machine" generally. ECF 46-2 at 22. It specially "recommended the machine blades [be] cleaned after 4 hours of continuous use," (*id*.) and "[a] thorough cleaning of the machine, including blades, . . . every 4 hours" to

---

[2] The parties' primary dispute is whether Plaintiff was "cleaning" the machine when she brushed debris away.

prevent buildup. *Id*. at 21. The user is warned that "[t]he following should only be done when it is certain the power has been disconnected," (*id*. at 22), and "[n]ever [to] slide your fingers down the edge of the blades lengthwise" when removing buildup (*id*. at 21).

9. Plaintiff testified at her deposition that she had read the Owners Manual before she first had used the Twister T2's machine and was otherwise familiar with the provided warnings. ECF 46-3 at 4.

10. For example, Plaintiff knew to "turn off and unplug the machine prior to cleaning it" because it "has to get wet in order to clean it" (*id*. at 3), and to avoid reaching inside the tumbler while the machine was still plugged in and the tumbler was spinning (*id*. at 4).

11. The Twister T2 bore a warning sticker that required the operator to "read and understand the instruction manual," and to "keep hands and body away from moving parts" in order "to reduce the risk of injury." ECF 46 at ¶ 11.

12. Plaintiff had seen the above warning sticker about keeping her hands and body away from the machine's moving parts. ECF 46-3 at 7.

13. Plaintiff was familiar with the warnings about operating the Twister T2. ECF 46-3 at 4.

14. Plaintiff denied receiving an instruction to turn the machine off to remove debris in the way she did. ECF 59-3 at 25, 27, 33. She was following the example of others. *Id*. at 25, 31. Neither the Owners Manual nor someone on site advised her not to reach over the tumbler and brush debris off the machine. *Id*. at 31. Plaintiff has "no idea" whether Keirton "failed to provide adequate warnings or instructions on how to use the Twister machine" because she "didn't get the training." *Id*. at 50.

15. On September 18, 2019, Plaintiff was at her place of employment, Los Suenos Farms, and operating the Twister T2. ECF 6 at ¶¶ 5-6.

16. The Twister T2 that Plaintiff was using on the day of her accident had a warning sticker advising her to keep her hands and body away from moving parts. ECF 46-3 at 97.17.

Plaintiff was clearing debris off the Twister T2 when her left hand became caught in the blades, resulting in the degloving of three fingers. ECF 6 at ¶ 6.

18. Plaintiff testified at her deposition that she was clearing leaves off the machine, an action she had done countless times before, when her hand was sucked into the blades, which she attributes to the force of the vacuum. ECF 46-3 at 5-6.

19. Plaintiff did not turn the machine off before she performed that action. ECF 46-3 at 6.

### IV. Plaintiff's Statement of Additional Material Facts ("SADMF")

For the sake of thoroughness and to the extent it adds context to Plaintiff's claims, the Court reviews the fact statements that Plaintiff includes in her Response (ECF 59). Keirton does not dispute these statements (except as otherwise noted).

1-9. Plaintiff's first nine SADMFs are drawn from the report of her expert witness, Stanley Jaworski. He opines that the rotating tumbler created a pinch point, or "in running nip point," with the stationary base underneath it. This had the effect of catching Plaintiff's fingers and drawing them inward to where they were exposed to the revolving blades. As a general matter, in-running nip-point hazards are a known risk which can be mitigated by the addition of a protective guard. ECF 59-4. The Court notes Defendants' hearsay objection to Plaintiff's reliance on the report for the purpose of opposing summary judgment. ECF 64 at n.1.

10. Keirton admits that it added "a shroud encompassing the tumbler . . . in approximately 2018." The Court adds that Keirton also explained why the shroud was not incorporated into the machine earlier. A later switch from hemp oil to water as the lubricant necessitated the shroud's addition, and time was needed to develop a durable transparent version of it. ECF 59-2 at 4-5.

11. When designing the original version of the Twister T2, Keirton had considered adding a tumbler guard. Ultimately, it decided against it for several reasons.

12. The primary reason for not adding the tumbler guard was to permit proper lubrication of the tumbler. In addition, a guard would interfere with air flow and limit the ability to see inside the tumbler. ECF 59-1 at 7. The Court notes Keirton's objection that it had "numerous" reasons for deciding against a guard, but it does not identify any others beyond those two.

13. Keirton does not dispute that its training video dated May 24, 2017 (two-and-a-half years before Plaintiff's injury) shows someone operating the Twister T2 with a protective guard over the tumbler. ECF 59-5.

14. The record contains an invoice for the sale of a Twister T2 and accessories to Plaintiff's employer on October 26, 2017. ECF 59-6. Plaintiff cites to that invoice to support her statement that Keirton "sold the Twister T2 to Los Suenos Farms, without a protective guard over the tumbler, in October of 2017." Keirton does not explain why it denies this statement.

15. Keirton provided on-site training to Los Suenos' employees on the use of the Twister, which Mr. Evans led. ECF 59-1 at 10-11.

16. Keirton began selling its "T-Zero" trimming machine in 2019 which contains safety sensor locks that prevent it from running if the tumbler guard is not in place. ECF 59-7. The Twister

T2 that Plaintiff used lacked these sensors. Keirton emphasizes that the "T-Zero" trimmer is a different product.

17. Los Suenos Farms purchased a T-Zero from Keirton on August 9, 2019. ECF 59-8.

18. Keirton does not dispute that the purchased T-Zero machine was not yet operational at Los Suenos Farms when Plaintiff was injured on September 18, 2019.

19. Keirton manufactured the tumbler guard in the photograph at ECF 59-19.

20. The design of the pictured tumbler guard does not reduce air flow. ECF 59-1 at 18.

21. Keirton sold its Twister T2 product in Canada with that same type of guard before Plaintiff's injury. *Id.* at 8, 18.

22. Plaintiff testified that leaf debris accumulates during the machine's operation. She "clear[ed] off the debris" because if it "pile[s] up too much," it hinders the tumbler's functioning. ECF 59-3 at 24, 33. Keirton denies this statement, but it does not explain why.

23-25. Plaintiff contends that Keirton provided no instruction to Los Suenos Farms' employees "on how to remove [or clear off] the debris that would build up on the machine while it is in operation." Keirton responds that the Owners Manual expressly includes leaf build-up in its cleaning instructions. ECF 46-2 at 13, 21.

26. Plaintiff denies intentionally putting her hand near moving machine parts when she went to clear the debris away. The deposition testimony to which she cites in support of that statement is somewhat ambiguous. She did use her hand to sweep off built-up debris, but she denied that the action involved "reaching into the machine at all." She added that she did not reach "towards the direction of the blades," stating "[t]hey have the guard for the blade, right?" She believes that it was the vacuum that sucked her fingers into the blades. ECF 59-3 at 33.

# LEGAL STANDARDS

## I.      Fed. R. Civ. P. 56(c)

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in the complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 247–48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings

themselves." *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324).

"[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

### I.  Presumption of Non-Defectiveness

Colorado law presumes that after a product has been in the marketplace for ten years, it is not defective, the manufacturer was not negligent, and "all warnings and instructions were proper and adequate." Colo. Rev. Stat. § 13-21-403(3). Keirton seeks the benefit of that presumption. Plaintiff responds that the presumption is rebuttable. In practical effect, if Plaintiff's strict products liability claim survives summary judgment on the merits,[3] she also rebuts the presumption. *Mile Hi Concrete, Inc. v. Matz*, 842 P.2d 198, 205 (Colo. 1992) (explaining that "a plaintiff who has presented sufficient evidence to defeat a motion for a directed verdict has necessarily rebutted the presumption of section 13-21-403(3)").

---

[3] Had Plaintiff's strict liability claims survived summary judgment, then the Court would have instructed the jury to take the presumption into consideration. This is because the record contains "by a preponderance of the evidence . . . the necessary facts giving rise to a presumption." Colo. Rev. Stat. § 13-21-403(4). *See Kokins v. Teleflex, Inc.*, 621 F.3d 1290, n.7, 1305-06 (10th Cir. 2010). It would be for the jury to determine if the product first entered the marketplace ten or more years before Plaintiff's injury date.

9

Whether Plaintiff rebuts the presumption is not at issue, however. Another reason precludes Keirton's ability to benefit from Colo. Rev. Stat. § 13-21-403(3), at least at this stage in the litigation. The evidentiary record leaves open the possibility that Keirton first sold its Twister T2 *less* than ten years before the date of Plaintiff's injury on September 18, 2019. Surprisingly, given the importance Keirton places on this defense, Keirton submits no direct, documentary evidence of when it first sold the Twister T2. The only evidence of such comes from Mr. Evans' testimony. Nor does Mr. Evans give an exact date when his company's machine first entered the marketplace. In his affidavit, he says that occurred in the year 2009, and at his deposition, he describes the time frame as 2009 or 2010. Keirton contends that there is no conflict between those two statements. If, as Keirton asserts, both statements are consistent, then that implies the possibility that it began selling the Twister T2 trimmer at any point within the 2009 to 2010 time frame. That leaves open the possibility that the product entered the market after September 19, 2009. Were that the case, then the product had not been on the market for a full ten years before Plaintiff's injury.

Construing the record in Plaintiff's favor, the Court is unable to find on summary judgment that the presumption of non-defectiveness applies to the Twister T2. However, that does not free Plaintiff from the burden of proving that the product is defective and of demonstrating how Keirton is strictly liable for it. *Mile Hi*, 842 P.2d at 205-06. The Court undertakes that merits analysis next.

**II.     Strict Products Liability**

Plaintiff suffered very serious injury while she was operating the machine. There is no doubt that the event was traumatic and painful, and she has permanent disfigurement. However, to hold Keirton liable for her injuries, she must establish a violation of the law. Plaintiff proceeds on a theory of strict liability.

### A.     Strict Products Liability, Generally

"Strict liability, however, is not the equivalent of absolute liability, and the fact that an accident may occur in connection with the use of a product does not necessarily mean that the manufacturer is liable." *Bartholic v. Scripto-Tokai Corp.*, 140 F. Supp. 2d 1098, 1106 (D. Colo. 2000). "A manufacturer has no duty to produce the safest product possible." *Squires v. Goodwin*, 829 F. Supp. 2d 1041, 1061 (D. Colo. 2011). Instead, the law "merely [requires the manufacturer] to avoid placing on the market a product which presents an unreasonable risk of harm to others." *Id*.

"In determining the extent of liability of a product manufacturer for a defective product, [the Colorado Supreme Court] has adopted the doctrine of strict products liability set forth in the Restatement (Second) of Torts § 402A (1965)." *Wilson v. City of Lafayette*, No. 07-cv-02248-PAB-BNB, 2010 WL 1291518, at *2 (D. Colo. Mar. 29, 2010) (citing *Camacho v. Honda Motor Co., Ltd.,* 741 P.2d 1240, 1244 (Colo.1987)). Dispositive to this analysis is the first prima facie element. It requires Plaintiff to show that Keirton sold the product "in a defective condition unreasonably dangerous to the user" for which Keirton "is subject to liability for [the] physical harm thereby caused to [her as] the ultimate user." *Wilson*, 2010 WL 1291518 at n.3. *See also Bartholic*, 140 F. Supp. 2d at 1106.

Plaintiff does not allege that Keirton was negligent, *i.e.*, that Keirton breached a duty of care owed to her directly. In contrast to the specific products liability theory on which Plaintiff does proceed, the negligence version of a products liability claim would place the focus on Keirton's conduct and whether it knew or should have known of the machine's unreasonable, non-obvious dangers and whether it was foreseeable that the lack of warning would cause the injury. *Mile Hi*, 842 P.2d at 203. By contrast, the focus of the strict liability inquiry is on the product itself

rather than the conduct of either the manufacturer or the injured user. *Wilson*, 2010 WL 1291518 at n.2.

### B. Failure to Warn, Generally

A product can be "defective" and "unreasonably dangerous," and thereby satisfy the first prima facie element, if warnings are absent or inadequate to ensure safe use. *Fibreboard Corp. v. Fenton*, 845 P.2d 1168, n.10 (Colo. 1993). "The purpose of a warning is to ensure that an otherwise dangerous product is used in a reasonably safe manner." *Wilson*, 2010 WL 1291518 at *4. "In determining whether, as a matter of law, a defect exists because of a manufacturer's failure to warn," a court must consider the warning's adequacy "in light of all the evidence." *Bartholic*, 140 F. Supp. 2d at 1114. A warning is adequate if following it would make the product safe for users. In addition, the manufacturer must label the product appropriately:

> giving due consideration to the likelihood of accident and the seriousness of consequences from failure to so label it as to warn of any dangers that are inherent in it and its use or that may arise from the improper handling or use of the product.

*Id*. In sum, "a warning is sufficient when it adequately informs the ordinary user of any specific risk of harm which may be involved in any intended or reasonably expected use." *Id*. By contrast, there is no duty to warn if the danger "is open and obvious," "unless there is a substantial likelihood that the proposed warnings would have prevented injury to the ordinary user." *Id*.

The Court adds that "the reasons which impose a duty to warn under strict liability also exist where the claim is based on negligence." In other words, viewing Plaintiff's claim through the lens of negligence can be instructive even if the two theories of products liability are distinct. *Wilson*, 2010 WL 1291518 at *5. Nevertheless, the focus of the strict products liability cause of action is on the product itself.

### C.     The Adequacy of Keirton's Warnings

Plaintiff attributes her injury to the absence of a warning about or instruction for safely removing leaf debris build-up. The Court notes that Plaintiff does not submit expert witness opinion of how the given warnings/instructions were inadequate. Her expert, Mr. Jaworski, considered only the machine's design and its lack of a guard. Nor does Plaintiff rebut Keirton's expert witness who regarded the advisory information as appropriate. Plaintiff herself does not say what warning Keirton should have added that would have prevented the injury. Presumably, the language of such a warning—were she to propose one—would advise against the use of hands to remove leaf debris build-up from the subject area of the machine (where the rotating tumbler creates a nip point with the blades). However, such a warning would be in substance redundant to the warnings already given. Not only did Keirton already advise against bodily contact with moving parts and to turn the machine off to clean it, generally, but also as the means to safely remove debris build-up, specifically. In other words, the evidence does not "suggest a substantial likelihood that [any suggested additional] warnings would have prevented this accident." *Bartholic*, 140 F. Supp. 2d at 1115.

The given warnings were not too vague to be useful. The warnings expressly included debris removal within the scope of "cleaning." Both the machine's physical set-up itself and the manual made clear that moving parts and blades were involved to cut the plant material. Plaintiff understood that she was placing her hand *near* the cutting site (even if she did not intend to reach into the specific area where moving parts actually made the cutting). In other words, the warnings when considered in light of how the machine functioned were specific enough in nature to be adequate for the purpose of avoiding the risk of harm that the nip point posed. The provided warnings were not "overly broad, and thus practically useless." *Fibreboard*, 845 P.2d at n.16.

The warnings were not ambiguous as in *Wilson v. LaFayette*. The warning at issue in that case reasonably could be read in two different ways. To the defendant's benefit, it could be read to cover the plaintiff's injury event. Or, it could be read to create a false sense of assurance that use of the device would *prevent* the occurrence of the injury event, thereby supporting the plaintiff's strict liability theory. *Wilson*, 2010 WL 1291518 at *6. Such ambiguity is not present here.

This case is similar to *Bartholic v. Scripto-Tokai Corp*. in which the Court found the existing warning adequate. In *Bartholic*, a child caused injury to another child after using a lighter that the parents had kept on top of a hot water heater in a closet. The lighter carried warnings to keep it away from, and to store it out of reach of, children. The Court found those warnings clearly and unambiguously to encompass the harm that occurred. Moreover, the parents knew themselves that the lighter posed a danger in the hands of a child. The plaintiffs offered no alternative warning that would have prevented what had happened. In practical effect, their failure-to-warn theory was "fundamentally a design-defect claim," that shifted focus to the need for better child resistant features. As such, the court granted summary judgment in the defendant's favor. *Bartholic*, 140 F. Supp. 2d at 1114-15.

What is not at issue in this case is the complete lack of warning or danger. That was the circumstance in *Mile Hi*, 842 P.2d at 200-01, and *Union Supply Co. v. Pust*, 583 P.2d 276, 278, 283, n.7 (Colo. 1978). In this case, Keirton did provide warnings, and for the reasons explained above, they were adequate.

On the existing record, a reasonable jury could not hold Keirton liable under Plaintiff's failure-to-warn theory. The Court grants summary judgment in Keirton's favor on this theory.

### III.     Plaintiff's Defective Design Theory

For present purposes, the Court assumes that the nip point that the machine's tumbler created was a generally known risk of danger. *E.g., Pust*, 583 P.2d at 171 (affirming that under the particular facts of that case, a jury could find a design defect from the lack of a safety guard or cleaning device at the "nip point" of the conveyor machine.) In other words, the nip point was a particular risk that was commonly known or knowable in light of recognized and prevailing scientific and technically knowledge available at the time of manufacture and thus was a risk about which Keirton could have warned users. *Fibreboard*, 845 P.2d at 1175. However, as the Court finds above, Keirton gave adequate warning of that danger. The evidence is undisputed that Plaintiff nevertheless did not turn the machine off before using her hand to brush away built-up debris.

A user's failure to follow instructions or warnings implicates the defense of "misuse." That defense arises from comment h to Section 402A of the Restatement (Second) of Torts (1965). As case law restates the defense:

> A manufacturer of a product is not legally responsible for injuries caused by a product if: (1) the product is used in a manner or for a purpose other than that which was intended and which could not reasonably have been expected by the manufacturer; and (2) such use rather than a defect, if any, in the product caused the plaintiffs' claimed injuries.

*Armentrout v. FMC Corp.*, 842 P.2d 175, 187 (Colo. 1992). The failure to follow instructions also is a form of misuse. *Shultz v. Linden-Alimak, Inc.*, 734 P.2d 146, 149 (Colo. App. 1987).

Misuse is a defense to the element of causation. "If the injured person's misuse of the product is the sole cause of damages, and thus, the alleged defect was not a cause thereof," then it "provides a complete defense to liability, regardless of any defective condition." *States v. R.D. Werner Co., Inc.*, 799 P.2d 427, 429-30 (Colo. App. 1990). Plaintiff argues that the "sole cause"

15

part of the complete version of the defense is not available here. Plaintiff rests her argument on the alleged lack of a "specific warning or instruction on how to clean the debris off [which] would have gone very specifically to the issue [of causation]." ECF 59 at 17. This argument is unavailing because the provided warnings were adequate to instruct how to remove debris safely.

Moreover, the non-compliance issue presents another bar to Plaintiff's ability to recover under strict liability, even on her alternative theory of a defective product. If adhering to a warning makes the machine safe for use, then it cannot be considered defective or unreasonably dangerous for strict products liability purposes. Comment j to Section 402A of the Restatement (Second) of Torts (1965) says that (1) a manufacturer reasonably may assume that the user will read and heed the given warnings and (2) "a product bearing such a warning, which is safe for use if it is followed, is not in defective condition nor is it unreasonably dangerous." *See Potthoff v. Alms*, 583 P.2d 309, 311 (Colo. App. 1978) (citing comment j).

The Court need not determine whether Plaintiff's theory of strict liability on the alternative basis of defective design should go to the jury because the provided warnings' adequacy resolves it, as well. As such, the Court also enters summary judgment in Keirton's favor on this aspect of Plaintiff's claim.

## **CONCLUSION**

The Court reiterates the very unfortunate nature of Plaintiff's injury. However, the law places a limit on a manufacturer's liability for injuries from use of its product. The product at issue here is a commercial-grade trimmer of plant material. Keirton advised against cleaning the machine—whether in terms of a thorough washing down or simply build-up removal—while it remained on and operating. Not only were the given warnings adequate, but full adherence would

have effectively made the product safe. As such, Plaintiff could not prevail on her strict product liability claims on this record.

Accordingly, the Court **grants** Defendants' Motion for Summary Judgment [filed August 25, 2022; ECF 46] as to all claims Plaintiff asserts against it. The Clerk of Court shall enter Final Judgment in Defendants' favor and close this case.

All pending motions are denied as moot, and all upcoming conferences and the trial dates are vacated.

Entered this 19th day of September, 2022, at Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge